# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

FRANK MALLERDINO,

        **Plaintiff,**

    **v.**                              **Case No.**     **03-C-0493**

PFIZER, INC., NICK RALLO & AMY PITTS,

        **Defendants.**

---

## DECISION AND ORDER

---

On May 27, 2003, this action was removed from Wisconsin state court and, on September 19, 2003, the plaintiff, Frank Mallerdino ("Mallerdino") filed his "Second Amended Complaint," containing five causes of action. First, Mallerdino claims that the defendants discharged him in violation of Wisconsin public policy. Second, Mallerdino claims that the defendants, Nick Rallo ("Rallo") and Amy Pitts ("Pitts"), interfered with his employment contract and, third, intentionally defamed him. In his fourth and fifth causes of action, Mallerdino brings claims of emotional distress against Rallo, Pitts, and Pfizer, Inc. ("Pfizer") (collectively "the defendants.") On June 1, 2004, the defendants filed their motion for summary judgment, which the Court now considers.

I.     SUMMARY JUDGMENT STANDARD

A court will grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "material fact" is one which, under the relevant substantive law, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact exists if a reasonable juror could find that the evidence supports a verdict for the nonmoving party. *Id*.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. When considering the movant's case, the Court should take all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hall v. Bennett*, 379 F.3d 462, 465 (7th Cir. 2004). If the movant meets his burden (by showing an absence of a genuine issue of material fact), the nonmovant may not rest on the pleadings. Instead, the nonmovant must come forward with evidence that there is a genuine issue for trial that would support a reasonable jury verdict on every issue for which he bears the burden of proof at trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *Celotex Corp.*, 477 U.S. at 322-24. If the nonmoving party bears the burden of proof on a matter at trial, and he is unable "to

2

establish the existence of an element essential to [his] case," summary judgment is appropriate. *Celotex*, 477 U.S. at 322-23.

II.    FACTS[1]

In March 1990, Mallerdino started working as an at-will employee for Pfizer, a major pharmaceutical company incorporated in Delaware with its principal place of business in New York, New York. (Defs.' Proposed Findings of Fact ["DPFOF"] ¶¶ 1, 2; Pl.'s Proposed Findings of Fact in Opp'n to Def.'s [sic] Mot. for Summ. J. ["PPFOF"] ¶ 2.)  During his tenure with Pfizer, Mallerdino worked as a Pharmaceutical Sales Representative, also called a "Health Care Representative," "Sales Representative," or "Sales Rep."  (DPFOF ¶ 2.) Mallerdino was assigned to work the "Quad-Cities District," a geographic region comprising western Illinois and eastern Iowa.  (DPFOF ¶ 11.)  He transferred from the Quad-Cities District to the Milwaukee, Wisconsin district in August of 1995.  (DPFOF ¶ 14.)

One of Mallerdino's primary job responsibilities was the distribution of "starters." (DPFOF ¶ 7.)  A "starter" is a packaged sample of Pfizer products that are provided to physicians who, in turn, distribute those starters to their patients. (DPFOF ¶ 7.) Physicians provide these starters so that patients may begin their medicine treatments before their prescriptions are filled.  (DPFOF ¶ 7.)

_____

[1] The following recitation of events is taken from the parties' proposed factual findings.  Many proposed facts have been omitted as irrelevant.

3

A significant part of this action involves two other Pfizer employees, Amy Pitts and Nick Rallo. Rallo started working for Pfizer in September 1997 and, except for a few months at the start of his employment, worked for several years as a Sales Representative in the Quad-Cities District until May 1, 2001. (DPFOF 16; PPFOF ¶ 16.) Rallo's and Mallerdino's respective tenures in the Quad-Cities District did not overlap. (DPFOF ¶ 17.)

Rallo left the Quad-Cities District and was promoted to the position of Assistant to the Regional Manager ("ARM") of the Midwest Region headquartered in Schaumburg, Illinois. (DPFOF ¶ 18.) Pitts was the Midwest Regional Manager. (DPFOF ¶ 18.) Pitts had started working for Pfizer in January 1990, beginning as a Sales Representative in Pfizer's Atlanta, Georgia District, and working her way up to the position of Midwest Region Manager in July 2000. (DPFOF ¶ 19.) Rallo began directly supervising Mallerdino when Rallo became a District Manager in January of 2002. (PPFOF ¶ 16.) Pitts, in turn, was Rallo's supervisor during much of the period between May 2001 and May 2003. (PPFOF ¶ 20; Def.'s Resp. ¶ 20.)

Around the time when he began supervising Mallerdino, Rallo reviewed portions of Mallerdino's personnel file. (PPFOF ¶ 73.) Rallo knew that Mallerdino was a successful representative whose personnel file showed no disciplinary problems during his tenure with Pfizer. (PPFOF ¶¶ 68, 73.)

Relevant to this action, Mallerdino alleges, and the defendants contest, that Rallo and Pitts were engaging in unlawful activity and conduct that contravened Pfizer policies.

4

Though Mallerdino goes into great detail when setting forth these activities, a summary list of claimed improprieties will suffice for present purposes. Mallerdino alleges that Rallo:

* used another Pfizer employee's credit card without that employee's authorization. (PPFOF ¶ 54.)

* submitted expenses to Pfizer more than once to obtain duplicate reimbursement. (PPFOF ¶ 61.)

* submitted charges to Pfizer for reimbursement directly to himself (Rallo) from another sale's representative's credit card. (PPFOF ¶ 61.)

* paid for the cost of a conference for a University of Iowa medical student. (PPFOF ¶ 64.)

* arranged for, and charged to Pfizer, parts of ski trips with University of Iowa medical residents. (PPFOF ¶¶ 90, 91, 92.) These residents also received honoraria (i.e., payments from Pfizer to individuals who speak to groups about Pfizer products (see PPFOF ¶¶ 81, 93)) from Rallo. Under Pfizer policy, honoria are to be given only to residents who attend conferences and speak at events about Pfizer products. (PPFOF ¶ 82.)

* expensed various social events, including concerts and sporting events, for University of Iowa medical residents to Pfizer. (PPFOF ¶ 121.)

* arranged for client hospitals to purchase extra drugs from him at the end of 2000–a practice known as "loading"– in order for Rallo to win performance bonuses and awards from Pfizer. (PPFOF ¶¶ 94, 96, 97.) For this favor, one institution received a mini-refrigerator, presumably from Rallo. (PPFOF ¶ 98.)

* arranged a promotion with a pizza company whereby physicians or medical residents could receive free pizzas and unearned honoria expensed to Pfizer. (PPFOF ¶¶ 103-107; 137-143.) No medical education programs were held at the pizza company's restaurant. (PPFOF ¶ 105.) Rallo then attempted to make other sales representatives bear the costs of this promotion while charging Pfizer twice for the expenses he did claim. (PPFOF ¶¶ 61, 109-13.)

5

* sponsored a Monday Night Footbal party in Iowa City, expensed to Pfizer, even though no medical education occurred at that gathering. (PPFOF ¶¶ 117, 118.)

* sponsored a program and boating day for University of Iowa medical residents and expensed food items to Pfizer in excess of those permissible limits established under Iowa law. (PPFOF ¶ 119.)

* between March and July 2002, consumed samples of Pfizer's drug Bextra from stock provided to Mallerdino for his sales duties. (PPFOF ¶ 130.) Rallo told Mallerdino to write off the drug samples that Rallo consumed. (PPFOF ¶ 130.) Rallo also had a physician friend of his send him Bextra samples that other sales representatives had dropped off for the physician's patients. (PPFOF ¶ 132.)

* provided a friend/relative with Zithromax. (PPFOF ¶ 134.)

* publicly congratulated Pfizer employees at a district meeting for sponsoring a dinner theater, even though the event violated Pfizer's rules. (PPFOF ¶ 135.)

* with Pitts, approved expense reports for sales representatives that exceeded Pfizer's permissible company rules for golf outings in 2002. (PPFOF ¶ 136.)

* purchased a Christmas gift card worth $255 for Pitts and expensed the cost to Pfizer in violation of Pfizer policy. (PPFOF ¶ 63.)

* approved expense reports for sales representatives that exceeded Pfizer's expense limits. (PPFOF ¶ 136.)

At least two of these claimed improprieties were reported to Pfizer's Human Resources Director Cheryl James ("James"). Specifically, James was made aware of Rallo's attempts to "load" product at the end of 2000 and his customer's receipt of a mini-refrigerator. (PPFOF ¶ 98.) Rallo's pizza promotion was also brought to the attention of Pfizer human resources. (PPFOF ¶¶ 113, 137.)

6

Mallerdino also alleges various improper conduct by Pitts.  Mallerdino claims that Pitts, from May 2001 forward, approved the expense reports that Rallo submitted to her and which exceeded Pfizer's company expense limits.  (PPFOF ¶¶ 13, 20, 135, 136.)  Pitts also purportedly received samples, from physicians, of the Pfizer drug Cipro to treat her own urinary tract infection.  (PPFOF ¶ 144.)  Mallerdino suggests that Pitts considered Rallo more suitable for promotion *after* she received a $255 gift certificate from Rallo, which he expensed to Pfizer.  (PPFOF ¶¶ 62, 63.)  Bearing all these claimed violations of Pfizer policy, procedure, and ethical rules, as well as state/federal law in mind, the Court now sets forth those facts directly related to Mallerdino's termination.

During a performance review on March 31, 2002, Mallerdino notified Rallo that he would be on vacation golfing during the first week of May 2002.  (PPFOF ¶ 147.) Unbeknownst to Mallerdino at that time, Rallo, in January 2002, had modified the vacation request procedure and required workers to provide him e-mail notification of vacation requests.  (PPFOF ¶ 150.)  When this new protocol was adopted, Mallerdino was on paternity leave from Pfizer and arrived late at a meeting where the new rule was distributed.  (PPFOF ¶ 151.)

During the first week of May 2002, Mallerdino golfed with two separate groups of physicians in Florida, and provided them with details of Pfizer's products.  (PPFOF ¶ 146.) Mallerdino, between golfing with the two groups, briefly worked in the field and delivered

7

a starter to at least one doctor's office.  (PPFOF ¶ 146.)[2]  The expenses for this trip totaled approximately $2,200.  (DPFOF ¶ 44.)

Rallo, at a company meeting in late May 2002, recollected Mallerdino's verbal request for vacation time.  (PPFOF ¶ 155.)  At that same meeting, Rallo inquired into Mallerdino's work expenses.  (PPFOF ¶ 154.)  Mallerdino told Rallo that he wanted to expense some of his Florida golf trip to Pfizer.  (PPFOF ¶ 154.)  Rallo advised him to submit all of his expenses from the trip.  (PPFOF ¶ 155.)

In June 2002, Rallo and Mallerdino, after they had been working in the field all day, stopped for a meal at a Milwaukee restaurant.  (PPFOF ¶ 156.)  During that meal, Rallo informed Mallerdino that Pfizer likely would not cover his golf trip expenses.  (PPFOF ¶ 156.)  Rallo then inquired whether Mallerdino had entered calls into his computer during the time he was golfing in Florida.  (PPFOF ¶ 157.)  Referencing Mallerdino's computer, Rallo and Mallerdino found that he had, indeed, entered calls for days that he was in Florida golfing with the doctors.  (PPFOF ¶ 158.)  Mallerdino had dated the starter forms with the date that he entered them into the computer; he did not think there was anything improper about that methodology.  (PPFOF ¶ 159.)  (In fact, James, the Human Resources Director, knew that not all representatives entered starters on the day that those starters were dropped with physicians even though such timely entry was a requirement under Pfizer policy.

---

[2] Mallerdino's proposed finding of fact, paragraph number 146, states that "he was in the field briefly dropping starters with doctors."  Mallerdino's declaration states that he "was in the field briefly dropping starters with at least one doctor's office, but [he] cannot remember the doctor's office name."  (Decl. of F. Mallerdino ¶ 6.)

(PPFOF ¶¶ 168, 178.)) Mallerdino explained that he often waited until the end of a month to enter calls into his computer, and, in this particular instance, had mistakenly entered his calls for the week he was golfing in Florida. (PPFOF ¶ 160.)

Mallerdino did not think the date on the starter form mattered as much as the witnessing physician's signature and an accounting of the sample drugs. (PPFOF ¶ 167.) No one at Pfizer had ever told Mallerdino that he should date starter forms for the date that the receiving physician accepted the drug sample. (PPFOF ¶ 166.) Beginning on June 1, 2002, Pfizer required representatives to enter starter forms on a weekly basis. (PPFOF ¶ 163.)

On July 18, 2002, Rallo, Pitts, and James convened a meeting in Milwaukee, Wisconsin, to terminate Mallerdino. (PPFOF ¶ 170.) Mallerdino had not been previously disciplined during his tenure at Pfizer. (PPFOF ¶ 8.) In fact, Mallerdino was widely respected among his co-workers and clients. (PPFOF ¶ 203.) It is disputed whether Rallo, or both Rallo and Pitts, provided the information about Mallerdino's purported wrongdoings that was discussed at the meeting. Mallerdino claims that Rallo was the sole source of the information, (see PPFOF ¶ 191), whereas the defendants claim that Pitts investigated the claimed falsification of the starter forms, (see Def.'s Resp. to PPFOF ¶ 191).

At the termination meeting, Pitts asked Mallerdino whether he knew that his trip had exceeded the permissible spending limits for entertaining doctors in terms of dollar amount and times per month. (DPFOF ¶ 56.) (Mallerdino, in fact, had paid for the entire trip out of

9

his own pocket and was not reimbursed by Pfizer. (PPFOF ¶ 165.)) Pitts also asked whether Mallerdino had told Rallo that he would be out of his territory during that week and whether he worked during that time. (DPFOF ¶ 56.) Rallo told Pitts and James that, when he had confronted Mallerdino about entering starters even though he was not in the field on the days identified, Mallerdino had told him that "I have it covered" or "I took care of it." (PPFOF ¶¶ 174, 185.) Though Mallerdino denied having made any such comments, James took this to mean that Mallerdino was attempting to cover up days where he had not been working and had not requested vacation time. (PPFOF ¶¶ 174, 175.)

At the meeting, Pitts accused Mallerdino of not properly requesting vacation when he was golfing without permission in May 2002. (PPFOF ¶ 180.) Later in the meeting, however, Rallo acknowledged that Mallerdino had previously mentioned that he would be taking some time off during that period. (PPFOF ¶ 180.) Pitts also accused Mallerdino of falsifying starter forms. (PPFOF ¶ 181.) (Remember that the dates on the starter forms were wrong, i.e., the forms were dated for when Mallerdino entered them into his computer rather than when the physicians received the starters.)

Mallerdino had explanations for his actions including disorganization, error, and the belief that his errors were not terribly significant. (PPFOF ¶¶ 182, 183.) He also disclaimed any intention of violating Pfizer policy. (PPFOF ¶ 184.) Nevertheless, Pitts stated that Mallerdino was being terminated to be consistent with her decisions on Pfizer policy

10

violations. (PPFOF ¶ 186.) James has testified that Pfizer typically terminated employees for intentionally falsifying records for starter documents. (PPFOF ¶ 187.)[3]

Mallerdino's termination was not the culmination of progressive discipline. He never received an immediate action plan, a performance improvement plan, or a final warning–all stages of Pfizer's performance management process. (PPFOF ¶¶ 35, 194.) Other Pfizer employees who worked in Pfizer's Midwest Region have been terminated for infractions of Pfizer's Starter Administration Guidelines. (DPFOF ¶ 67.) Most of these terminated employees had received prior disciplinary actions before being terminated for violating Pfizer's starter guidelines. (PPFOF ¶¶ 225-32.)

## III. ANALYSIS

Mallerdino concedes that certain of the claims contained in his second amended complaint do not have a basis in fact. Specifically, his claims for intentional infliction of emotional distress and defamation are not supported by the evidenced adduced during discovery. (Pl.'s Opp'n Br. 40 n.8.) Thus, those claims are dismissed as to all defendants. That leaves two counts from the complaint: wrongful discharge in violation of public policy and tortious interference with contract.

### A. Wrongful Discharge in Violation of Public Policy

The Court must first address a purely legal question posed by the parties and central to Mallerdino's first cause of action: Whether Wisconsin law permits a cause of action for

---

[3] The Court will set out further facts and examine other employees' disciplinary actions in its analysis of Mallerdino's tortious interference claim.

11

wrongful discharge in violation of public policy when an employee is fired because his supervisors, who have purportedly engaged in unlawful activity, think that the employee knows about their illicit conduct. The parties agree on the current limits of established Wisconsin law, which does not recognize a claim in such circumstances. Mallerdino asks this Court to expand the parameters of liability under the tort of wrongful discharge.

Generally speaking, an at-will employee may be fired, without recourse, at the will of the employer. Such terminations may be for any reason or for no reason at all and without cause. *See Goggins v. Rogers Mem. Hosp. Inc.*, 683 N.W.2d 510, 514 (Wis. Ct. App. 2004). However, an action may lie for wrongful discharge where an at-will employee's termination is contrary to a fundamental and well-defined public policy. *See Brockmeyer v. Dun & Bradstreet*, 335 N.W.2d 834, 840 (Wis. 1983). This "exception" to the general contours of at-will employment is "narrow." *Id.* at 841. The *Brockmeyer* Court explained:

> A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end.

*Id.* at 840.

*Brockmeyer* paved the way for the Wisconsin Supreme Court's recognition that a public policy could also be grounded upon an administrative rule, as well as a statute or the constitution. *See Winkelman v. Beloit Mem. Hosp.*, 483 N.W.2d 211, 212 (Wis. 1992). In *Winkelman*, the court found that a nurse's discharge for her refusal to violate an

12

administrative rule came within the purview of public policy exceptions to the at-will doctrine. *Id.* In *Strozinsky v. School District of Brown Deer*, the court explained that expressions of public policy could be implicit, and a discharge in violation of the spirit of a law or provision could substantiate a claim of wrongful discharge. 614 N.W.2d 443, 453 (Wis. 2000).[4]

The Supreme Court of Wisconsin has declined to extend the public policy exception to generally protect whistle blowers. *See Hausman v. St. Croix Care Center*, 571 N.W.2d 393 (Wis. 1997). Here, Mallerdino did not report the purported unlawful conduct. He made no attempt to do so, and, as far as the Court knows, still has not done so. Thus, Mallerdino cannot say that he was punished for acting in accordance with the law. Nor does he claim that he was fired for refusing to act contrary to the law. Mallerdino cannot make these claims because he did not *do* anything. In fact, Mallerdino is not even saying he was terminated because of what he knew; his real argument is that he was terminated because of what Rallo and Pitts thought he knew.[5] Mallerdino recognizes these myriad problems, and characterizes his termination as a preemptive measure to prevent him from going to the authorities. (*See* Pl.'s Opp'n Br. 5.) In his own words, this is Mallerdino's "public policy" argument:

---

[4] *Strozinsky* contains an excellent chronology of the development of the public-policy exception in Wisconsin case law.

[5] The following facts are undisputed: Mallerdino, at the time he was deposed for this action, had no first-hand knowledge of Rallo's activities while Rallo worked as a sales representative in Iowa City. Nor, at the time of his termination, did Mallerdino think that Rallo or Pitts were aware that Mallerdino had heard rumors about their purported conduct. (DPFOF ¶¶ 25, 26.) At the time of his termination, Mallerdino had no intention of reporting any of Rallo's rumored activities, nor had anyone told him to refrain from doing so. (DPFOF ¶ 24.)

13

The public interest and public policy at stake here (as embodied in the Prescription Drug Marketing Act, the FDA regulations implementing that act and other pharmaceutical provisions, Title 21 of the United States Code and related provisions of the Code of Federal Regulations implementing that Act, Chapters 450 and 961 of the Wisconsin Statutes regulating prescription drugs, and the Iowa Gift Law) is *protecting health by restricting the types of pharmaceutical companies' drug marketing activities* to *physicians and clinics.* Congress and the states have regulated these activities to protect consumers' health and shield them from the consequences of illegal or unethical sales tactics to the medical profession. The strength of this public policy can be seen in the breadth of its expression, from federal and state laws to federal and state administrative regulations, all with one goal–the protection of the public health. Defendants' discharge of Mr. Mallerdino preemptively, before he could report their violations, harmed the public health by preventing this key information about a major drug manufacturer's conduct from being reported to authorities.

(Pl.'s Opp'n Br. 6-7.)

The defendants astutely point out that Mallerdino's termination in no way curbed his ability to report the defendant's purported violations.[6] That point aside, the above quote does not explain how Mallerdino's proposed public policy exception fits within *Hausman*'s refusal to create a broad, general whistle blower exception. *Hausman* reiterated *Brockmeyer*'s position that the focus of the public policy exception "has been not just on the public interest, but also on the valid interests presented by employers and employees." *Hausman*, 571 N.W.2d at 397.

---

[6] Recognizing that the threatened loss of employment may be a coercive tool, the Court nevertheless does not understand the basis for Mallerdino's claim that the defendants "'shot the messenger' before Mr. Mallerdino could take his information to anyone: the FDA, the media, or other supervisors within Pfizer." (Pl.'s Opp'n Br. 3.)

14

Mallerdino's public policy argument does not implicate Mallerdino's interests in any way, or the employer/employee relationship.[7] An employer's unlawful activity does not necessarily implicate aspects of its relationship with its employees. It *can*, if, for example, the employee is asked to contravene existing law or is terminated for refusing to do so. Mallerdino's public policy argument, however, is little more than a paean to the importance of laws. Obviously, public interests are implicated whenever a law is broken. This is not enough to qualify as a public policy exception to the at-will doctrine. Mallerdino has failed to convince the Court that a claim for wrongful discharge lies (1) where an employee is terminated based on his employer's belief that he may possess information about his employer's unlawful or improper conduct and (2) the employee has neither been asked to violate a law or regulation nor has attempted to exercise any conferred or established rights.

Mallerdino was not wrongfully discharged in violation of public policy.

B.     Intentional Interference

Mallerdino alleges that Rallo and Pitts intentionally interfered with his employment contract. Under Wisconsin law, a tort for interference with contract may lie even in the context of at-will employment. *See Mackenzie v. Miller Brewing Co.*, 608 N.W.2d 331, 349 (Wis. Ct. App. 2000). To establish such interference, Mallerdino must show that (1) he had a contractual relationship with Pfizer; (2) Rallo and Pitts interfered with that relationship or induced a breach; (3) the interference was intentional; (4) there was a causal connection

---

[7] On this basis alone, the cases cited by Mallerdino supporting a claim of preemptive discharge are distinguishable. (*See* Pl.'s Opp'n Br. 6.)

15

between the interference and any damages that Mallerdino suffered; and (5) Rallo and Pitts did not possess any right or justification for their interference. *See Dorr v. Sacred Heart Hosp.*, 597 N.W.2d 462, 478 (Wis. Ct. App. 1999).

The parties dispute whether Rallo's and Pitts's actions were "privileged." To determine whether interference is improper, i.e., not privileged, Wisconsin courts consider the following factors:

> (a) the nature of the actor's conduct;
> (b) the actor's motive;
> (c) the interests of the other with which the actor's conduct interferes;
> (d) the interests sought to be advanced by the actor;
> (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other;
> (f) the proximity or remoteness of the actor's conduct to the interference; and
> (g) the relations between the parties.

*Mackenzie*, 608 N.W.2d at 350. Because they are interrelated in this instance, the court addresses the first two factors of the privilege analysis, conduct and motive, together.

Mallerdino thinks that Rallo lied in order to have Mallerdino terminated. These lies are comprised of two representations: (1) Rallo's statement that Mallerdino had not requested vacation time for his trip to Florida and (2) that Mallerdino deliberately changed the dates on his starter forms to conceal his time out of the field. (Pl.'s Opp'n Br. 26.) When Mallerdino makes these arguments in his brief, he states that "Rallo gave crucial false information to Defendant Pitts and . . . James, that convinced them to terminate his employment." (Pl.'s Opp'n Br. 14, 26.) Similarly, Mallerdino states that "Rallo also lied to Defendant Pitts and Defendant James, asserting that Mr. Mallerdino deliberately changed

16

dates on the starter forms to conceal his time out of the field." (*Id.*) Curiously, at the same time that Mallerdino is alleging that both Rallo and Pitts interfered with his employment relationship, Mallerdino argues that Rallo essentially duped Pitts with lies. It is unclear what Pitts did improperly if she was simply utilizing the information provided by Rallo.[8]

In his brief, Mallerdino does not deny that he did not comply with Pfizer's administrative guidelines when he failed to send an email to Rallo requesting time off. (*See* DPFOF ¶ 39, 43.)[9] Mallerdino provided only verbal notice. So, technically speaking, Mallerdino had not complied with Pfizer procedure and, from that perspective, had not requested vacation time. Rallo's "lie," according to Mallerdino, stems from Rallo's failure to acknowledge–at least initially at Mallerdino's termination meeting–that Mallerdino had verbally requested vacation time. Yet, it is undisputed that, later in the termination meeting, Rallo acknowledged that Mallerdino had previously spoken to him about taking vacation time. (If Rallo was lying, he chose an usual time–during Mallerdino's termination meeting– to abandon his deceit.)

Mallerdino also alleges that Rallo falsely accused Mallerdino of deliberately changing dates on starter forms to hide his absence from the field. It is undisputed that Mallerdino

---

[8] Pitts's unprivileged conduct, according to Mallerdino's brief, consists of failing to verify Rallo's information before terminating Mallerdino. (*See* Pl.'s Opp'n Br 27.)

[9] Mallerdino states that he "was not aware that Defendant Rallo had changed the vacation request rule to require e-mail notification of vacation requests." (PPFOF ¶ 150.) At the time that Rallo enacted the e-mail vacation request rule, "Mallerdino was on paternity leave from Defendant Pfizer after the birth of his third child; he came unpaid to the meeting where the rule was promulgated but he arrived late and missed the handout containing the e-mail vacation request rule." (PPFOF ¶ 151.) The import of these explanations is uncertain. Mallerdino does not claim that the e-mail request procedure did not apply to him.

17

entered dates on starter forms that did not correlate to the dates on which he left those starters with physicians. (*See* DPFOF ¶ 39.) The issue of contention between the parties is whether the entry of erroneous dates was intentional. (*See* PPFOF ¶ 160; DPFOF ¶ 41.) Rallo's "lie," on this issue, concerns *why* Mallerdino changed the dates on the starter forms.

Making things somewhat muddled, the defendants do not clearly state their claimed reasons for terminating Mallerdino. At one point, the defendants claim that the discrepancy between the dates on the starter forms and the dates that Mallerdino actually "dropped," i.e., delivered, the starters is the cause of Mallerdino's termination. Thus, the defendants state that "the undisputed facts are that Mallerdino was terminated for the simple reason that he falsified Starter Activity forms by claiming that he had dropped dozens of starts [sic] off at doctors' offices during the week of May 6, 2002, when he was actually golfing with two sets of doctors in Florida." (Defs.' Br. 9.) Yet, the proposed factual finding supporting this quote states that "Pitts told Mallerdino that Pfizer and FDA policy is that he was to enter calls and starters on the day that he made them." (DPFOF ¶ 60.) When starters are actually entered into the representative's computer, however, appears to be a separate concern from the accuracy of the date entered on the starter form. In other words, a starter form could be accurate, but a representative could still violate Pfizer policy by failing to enter that information into his computer in a timely fashion. Furthermore, two additional issues were discussed at Mallerdino's termination meeting: his failure to request vacation time and his excessive expenses. Though these seem to be reasons Pfizer raised to justify his termination

18

during the July 18th meeting, the defendants focus solely on the claimed falsification of starter forms when arguing the present motion for summary judgment.

Before this Court, the defendants do not argue that Mallerdino was terminated for failing to enter his calls into his computer in a timely fashion–though this issue was discussed at Mallerdino's termination hearing. Mallerdino, in his brief, seems to touch on this issue when he states that "James admitted that *she knew of no other case where a Pfizer representative was terminated for unknowingly entering starters on the wrong day.*" (Pl.'s Opp'n Br. 27.) This quote clearly relates, not to falsification of starter forms, but to their delayed or untimely entry into the representative's computer. Though Mallerdino raises this issue, he does not connect it to those claimed lies by Rallo, which Mallerdino believes led to his termination. Rallo, according to Mallerdino, only lied about the falsification of the starter forms. Based on the parties briefings, the Court understands that Mallerdino's tardy entry of starter information into his computer was not a factor in his termination.

A salient question is whether entering an incorrect date on a starter form is a violation of Pfizer policy or guidelines. Mallerdino states that "Defendant Pitts and Cheryl James took Defendant Rallo's lies (that Mr. Mallerdino did not request vacation time off and that he deliberately changed starter dates to conceal his time out of the field) and used them to terminate Mr. Mallerdino *for supposed policy violations.*" (Pl.'s Opp'n Br. 27) (emphasis added). The phrase "supposed policy violations" may mean either that the charges against Mallerdino were fabricated or, even if true, did not violate any Pfizer policy. Yet, Mallerdino

19

does not claim that he complied with Rallo's email vacation request procedure. Furthermore, the Court understands that there is no dispute that Pfizer could discipline an employee for intentionally falsifying starter information. (*See, e.g.*, Pl.'s Opp'n Br. 32, 34, 35.)[10]

Intentional falsification of starter forms constitutes a legitimate basis for employee discipline. (*See* Def.'s Resp. to PPFOF ¶ 166.) Though unclear, Mallerdino seems to argue that only *intentional* falsification is cause for discipline. The Court sees no factual basis for this representation. Mallerdino acknowledges that similar conduct by other employees has resulted in various forms of discipline and he does not argue that such discipline was improper. (*See* Pl.'s Opp'n Br. 32 ("Other representatives who had problems entering starter forms or who had starter form discrepancies like Mr. Mallerdino's or worse were disciplined but not terminated.").) Whether starter form falsification violated a particular policy or rule is a discrete issue from whether Mallerdino's conduct was intentional or whether his punishment, i.e., termination, was too severe. Thus, the fact that Mallerdino's conduct may have violated certain policies or administrative guidelines and potentially qualified for some type of discipline is not inconsistent with his claims that he was never informed that he had to date starter forms with the date that the physician received the drug sample, or his claim that many representatives entered dates in the same fashion. (PPFOF ¶¶ 162, 166, 188.)

---

[10] While this understanding controls, the Court acknowledges that it cannot identify, based on the parties' arguments, which exact guideline or policy is violated when a representative, either intentionally or unintentionally, enters an incorrect date on a starter form. Pfizer states that "[t]he Starter Activity Forms clearly indicate the date that is supposed to be entered is the date that the starter is 'dropped' with the doctor." (*See* Def.'s Resp. to PPFOF ¶ 166.) However, the Court has examined a Starter Activity Form, (see Decl. of A. Pitts in Supp. of Defs.' Mot. for Summ J., Ex. J), and that requirement is not apparent on the face of the form.

20

Drawing all inferences in Mallerdino's favor, a jury could find that Rallo lied about Mallerdino's failure to informally request vacation time. A jury could also find that his failure to enter correct dates on the starter forms was unintentional error.[11] Insofar as his conduct was unintentional, a jury could find that other employees would not have been disciplined for the same conduct. Thus, Rallo's and Pitts's "lies" overshadowed the inadvertent nature of Mallerdino's conduct and Mallerdino's termination ran counter to the lenient manner in which Pfizer handled other employees' disciplinary matters.

Motive, the second criterion that the Court must examine, seems to be a critical issue in this case. Mallerdino claims a specific improper motive, i.e., that Rallo and Pitts wanted Mallerdino out of the company because they thought that he knew about their unlawful activities. Despite this theory, Mallerdino has not presented any evidence showing that Mallerdino knew about Pitts's and Rallo's purported unlawful/improper activities during his employment with Pfizer. Nor, has any direct evidence been proffered that Rallo or Pitts thought that Mallerdino knew about their purported activities. Mallerdino is drawing inferences from circumstantial evidence.

The defendants' Proposed Fact No. 26 states that, as far as Mallerdino knew at the time of his termination "neither Rallo nor Pitts were aware that Mallerdino was aware of the

---

[11] It is not clear from Mallerdino's brief in what sense his entry of incorrect dates on the starter forms was unintentional. "Unintentional" could mean that he intended to place different dates on the forms, or, "unintentional" could mean that he knowingly placed the incorrect dates on the form without realizing that the dates, under Pfizer guidelines, would be considered "incorrect" or "falsified" and without knowing that such conduct violated Pfizer guidelines. As best the Court can discern, Mallerdino seems to be making the latter argument.

21

rumors regarding Rallo's marketing activities while he worked in Iowa City." (DPFOF ¶ 26.)

Mallerdino disputes this fact, but offers only the three following facts in support of his

denial:

> 66. When he started as District manager, Defendant Rallo became aware that Mr. Mallerdino had worked for some time in Iowa in Rallo's old district at Defendant Pfizer. [citations omitted.]

> 73. At the time that Defendant Rallo started as Mr. Mallerdino's District manager effective January 1, 2002, Rallo reviewed at least portions of Mr. Mallerdino's personnel file at Pfizer and observed that Mr. Mallerdino had never been disciplined by Pfizer. [citations omitted.]

> 74. When Defendant Rallo became a District manager, Fischer suggested that Rallo lean on Mr. Mallerdino for advice as a senior representative; Fischer and Rallo talked about Mr. Mallerdino's prior success as a sales representative for Defendant Pfizer in Iowa.

(PPFOF ¶¶ 66, 73, 74.) These facts do not reasonably support the inference that Rallo or

Pitts thought that Mallerdino might have been aware of rumors circulating about Rallo. No

reasonable inference, from the above facts alone, could lead to a finding that Rallo and Pitts

sought Mallerdino's termination because he knew of their improper and unlawful doings.[12]

In his opposition brief, Mallerdino urges the court to examine what "Rallo and Pitts

understood that Mr. Mallerdino knew or *could have known or found out* about Rallo's and

Pitts' illegal and unethical activities." (Pl.'s Opp'n Br. 28.) Even accepting this framing of

the issue, the Court questions the basis for Mallerdino's belief that Rallo or Pitts thought he

---

[12] The Court has not considered the purely speculative and self-serving facts in which Mallerdino states that Rallo had to know that he (Mallerdino) knew about his (Rallo's) past in Iowa. (*See* PPFOF ¶ 195.) Nor has the Court considered the speculative and self serving statement, by Mallerdino, that Pitts terminated him "in order to protect [Rallo] because [he] had this dirt on Nick" and Pitts knew that she had approved certain of Rallo's improper expenses. (*See* PPFOF ¶ 196.)

knew about their conduct. Mallerdino hypothesizes that Rallo thought that Mallerdino knew about Rallo's improper conduct because Mallerdino had worked in Rallo's old district in Iowa and knew some people who had worked with Rallo. (*See* Pl.'s Opp'n Br. 28-29.) This is all that Mallerdino offers once the Court pares away conclusory statements, unfounded allegations, and insinuation.

There is a second prong to Mallerdino's "motive" argument. Mallerdino points to various employees who received progressive discipline before their terminations.[13] Mallerdino also identifies employees who incorrectly managed starter forms and were not terminated. The Court understands Mallerdino to be arguing that a fact finder could infer from his disparate treatment that the defendants' proffered reasons for his termination are pretextual.[14] (The same facts supporting this portion of Mallerdino's motive argument also

---

[13] Mallerdino unnecessarily violated this Court's local rule related to page limits in briefing. His brief contains the same arguments, repeated verbatim, related to the discipline of other employees. (*See* Pl.'s Opp'n Br. 20-25; 33-37.) Mallerdino likewise repeats the text of his brief, originally found on pages 16-18, on pages 28-30. Mallerdino would not have needed to exceed this Court's page limits if he had avoided such needless repetition in the first instance.

[14] The bulk of information related to these other employees and their disciplines may be found in the Declaration of Frank Mallerdino, and the exhibits attached thereto. In his declaration, Mallerdino identifies each disciplinary form for the respective Pfizer employee and then explains its contents. The Court questions whether it may even consider these exhibits. Clearly, Mallerdino does not possess personal knowledge about the disciplinary papers of other employees. *See Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994). Nor could he testify about those documents' contents.

If Mallerdino was simply intending to enter the documents as exhibits, presumably as business records, he would need to conform to Rule 803(6) of the Federal Rules of Evidence. Admitted as such, the disciplinary records would be excepted from the prohibition on hearsay. However, even business records must be authenticated consistent with Rules 803(6) and 901(a) of the Federal Rules of Evidence. Laying such a foundation, in this instance, would require testimony from the custodian or another qualified witness about Pfizer's regular record-keeping practices related to disciplinary measures. *See Caulfield & Assocs., Inc. v. Litho Productions, Inc.*, 155 F.3d 883, 888 (7th Cir. 1998). The Court must be satisfied, by sufficient evidence, that the proffered documents are what Mallerdino claims. *See* Fed. R. Evid. 901(a).

The Court has been given no information to suggest that Mallerdino is the custodian of these documents or records. Thus, he must seek their entry by claiming that he is an "other qualified witness." Though it is likely that Mallerdino has no such qualification to authenticate these exhibits, the defendants have not raised any evidentiary objection to these submissions. Thus, the Court understands that the authenticity of these exhibits is not in dispute.

23

inform his argument that Rallo's and Pitt's conduct was improper.)  It does not appear that Mallerdino is arguing that Pfizer could not have terminated him or even that Pfizer had to take less extreme disciplinary measures.  Nor is Mallerdino arguing that Pfizer had to progressively discipline him before terminating his employment.  The Court understands Mallerdino to be arguing that his excessively harsh disciplinary treatment points to some improper motive by the defendants.

The defendants have identified employees who were fired, or about to be fired, for violating Pfizer's Starter Administration Guidelines. (DPFOF ¶ 67.)  Most of that number received some form of lesser discipline prior to their final terminations.  (PPFOF ¶ 225-32.) The parties dispute whether some of these employees received lesser disciplines–i.e., some discipline short of termination–for violating Pfizer's starter guidelines.  (*See* Pl.'s Resp. to DPFOF ¶ 67.)  Specifically, Mallerdino disputes that "[n]one of these former Pfizer employees were placed on a performance improvement plan ("PIP") or given any other type of warning prior to being terminated for violating Pfizer's Starter Administration Guidelines."  (DPFOF ¶ 67.)  The Court examines these files and the parties' dispute more carefully.

Shanna Daniels, a Pfizer employee identified by the parties, did not receive prior discipline before being terminated for violating Pfizer Starter Policy. (PPFOF ¶ 228.)  Chad Weer was terminated for deliberately changing dates on starter forms. (PPFOF ¶ 235.) Other employees, Stephanie Kinney ("Kinney"), Kim Pope ("Pope"), Pattie Collins ("Collins"),

Kellap Grant ("Grant"), and Jeff Congleton ("Congleton"), did receive some form of discipline prior to termination.  (*See* Mallerdino Decl. Exs. G, H, J, K, & L.)  Though Kinney's disciplinary file does contain an Immediate Action Plan (IAP), the Court does not see evidence that the implementation of that plan was intended to address problems with Kinney's starter form activity.  Pope's disciplinary documents likewise contain evidence of pre-termination discipline, but not ostensibly related to starter form activity.  Pope was ultimately terminated, in part, because she deliberately changed dates to make it appear that she had made calls and dropped starters when she did not, in fact, do so.  (PPFOF ¶ 227.)  Pfizer employees Collins and Grant also were disciplined, prior to termination, but those disciplines did not relate to starter activity.  (PPFOF ¶¶ 229, 230.)  Congleton's disciplinary documents are partially obscured by a post-it note photocopied on the face of the first page of that exhibit.  It appears, though, that he may have been disciplined for starter form irregularities before he was ultimately terminated for the same conduct.  It is undisputed that all of these employees were terminated for violating Pfizer' starter guidelines.

Mallerdino has presented facts related to the discipline of other Pfizer employees as well.  Mallerdino has pointed to employees who were employed by Pfizer and disciplined during the two-year period following Mallerdino's termination.  Certain of these employees received discipline short of termination for failing to accurately record and submit starter forms, failing to enter starter forms into their computers in a timely manner, and not properly documenting starter transactions.  (*See* PPFOF ¶¶  239, 240, 243, 244, 246, 247, 248, 250,

251, 256.)  Mallerdino has also pointed to employees who received disciplines short of termination for failing to account for their time while outside their sales territories.  (*See, e.g.*, ¶¶ 247, 251, 256, 257, 261.)

Mallerdino, in his brief, highlights the situations of two employees.  Steven Weber ("Weber"), a sales representative who reported to Pitts and Rallo in 2002, failed to enter calls and hundreds of starter forms into his computer in 2002.  (PPFOF ¶¶ 218, 219.)  He also skipped work on multiple days without permission in order to catch up on his backlog. (PPFOF ¶¶ 218-219.)  Rallo, when reviewing Weber's work, examined his starter forms in a cursory fashion.   Mallerdino, in his brief, contrasts this methodology with Rallo's meticulous examination of Mallerdino's file.  Mallerdino seems to be arguing that Rallo was looking for reasons to discipline Mallerdino and thus looked at his work differently from that of other employees.[15]

Mallerdino also highlights the situation of Patrick Mahoney ("Mahoney"). Apparently, Mahoney confronted Rallo over the latter's alleged improprieties.  Mallerdino provides no other insight into the circumstances surrounding Mahoney's employment with

---

[15] After setting forth the details of Weber's behavior, Mallerdino states:

What accounts for the striking difference in treatment of the same facts between Steve Weber's situation and Mr. Mallderino's?  *Two crucial facts*: (1) Steve Weber did not know about Defendant Rallo's illegal and unethical dealings in Iowa, and (2) Weber was a new hire by Defendant Pfizer. . . . .  These facts eliminated Weber as any threat to Defendant Rallo, so he was treated much better by Defendants Rallo and Pitts.  They had no reason to trump up charges against him or accuse him of anything to justify terminating him, so they just put him on a Performance Improvement Plan to correct his sloppy administrative behavior.  Weber addressed and corrected the issue, passed the plan, and he still works for Defendant Pfizer."

(Pl.'s Opp'n Br. 33-34.)

Pfizer.  The Court does not know whether Pfizer terminated Mahoney's employment.  Furthermore, Mahoney's conflicts with Rallo formed only "part" of his reasons for leaving Pfizer.  The Court does not know what other circumstances prompted his departure.  The Court can do little with such vague information.

Mallerdino has also pointed to various employees who knew of Rallo's purported inappropriate activity and whom Pitts failed to promote.  (*See* PPFOF ¶ 214.) (Mallerdino explains that, because Pitts is not these employees' district manager, she could not arrange for their termination. (*See* Pl.'s Opp'n Br. 37.))  The defendants' most common responses to these various facts related to other employees' discipline is the same: None of these employees falsified Starter Activity Forms.  Two employees, Suzi Spayd and Frank Marsh, who *did* falsify starter forms, only received a final warning and a Performance Improvement Plan, respectively.   (PPFOF ¶¶ 241, 255.)   Neither Spayd nor Marsh, however, was supervised by Pitts.[16]  (Def.'s Resp. to PPFOF ¶¶ 241, 255.)

The question before this Court, at least with respect to the defendants' motive, is whether the defendants have shown that there is no genuine issue of material fact regarding their motivation for terminating Mallerdino's employment.  While issues of motivation and intent are "particularly inappropriate for summary judgment," the Court must still find that improper motive could be *reasonably* inferred from the facts presented.  *See Conrad v. Delta*

_____

[16] Kay DeLong, see PPFOF ¶ 250, was disciplined for "starter form discrepancies."  This fact provides little information about the nature of those discrepancies.  Similarly, the Court does not know how Marilyn Nelson, another Pfizer employee, failed to accurately complete her starter forms.  (PPFOF ¶ 258.)

*Airlines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974). To summarize, Mallerdino bases his improper motive argument first on the fact that he worked in the geographic district where Rallo purportedly engaged in his unlawful activities, and thus claims that Rallo had reason to be wary of him. Second, Mallerdino points to employees who were punished less severely for infractions of the starter policy guidelines and/or other Pfizer rules. Some of these infractions, though intentional, resulted in discipline short of termination.[17]

Drawing all inferences in Mallerdino's favor, a fact finder could find that Mallerdino was singled out for excessively harsh discipline in the form of termination. There, is, however, still an insuperable gap in Mallerdino's argument. Pfizer has shown that individuals were terminated for violating Pfizer's starter polices and guidelines. Mallerdino argues that those violations were more egregious and intentional. Even so, these facts do not rationally suggest or evince the motive that Mallerdino posits. Perhaps the defendants did not like Mallerdino and seized on the smallest infraction of Pfizer's rules to justify his termination. Pfizer may have even chosen to selectively enforce certain starter requirements against Mallerdino alone while letting other employees perform similar actions without consequences. Even so, these actions do not point to the improper motive that Mallerdino claims. Nor do they suggest that Pfizer or its management personnel acted beyond their permissible bounds under Wisconsin law. In order for Mallerdino to raise an issue of fact

---

[17] Mallerdino, in several proposed findings of fact, states that the respective employee's transgressions were performed "deliberately." (*See, e.g.*, PPFOF ¶ 235.) For many other facts involving employee misconduct, the issue of intent is not addressed. (*See, e.g.*, PPFOF ¶ 239.)

28

as to the improper motive he claims, he must show that a finder of fact could reasonably infer from the various disciplines of other employees for similar infractions of Pfizer rules, that Rallo and Pitts terminated him because they thought that he knew of their unlawful conduct. There is simply no basis in the record for such an inference.

The remaining points of the privilege analysis are given little treatment by the parties. If Mallerdino's allegations are true, the defendants deprived him of gainful employment. The parties' respective positions parallel society's interests as embodied in the at-will doctrine and the limits imposed by the tort of tortious interference. Questions still remain about Rallo's and Pitts's motives, even assuming the veracity of Mallerdino's allegations. Mallerdino has failed to make any reasonable argument as to why his termination promoted Pitts's or Rallo's interests. That is, Mallerdino's termination has no logical bearing on his ability to report wrongdoing to Pfizer or federal and state authorities.

Regarding society's interests, Mallerdino argues that he should be free to report wrongdoing without fear of reprisals. Mallerdino *is* free to report any suspected wrongdoing. No action taken by the defendants have deprived him of that ability. Thus, the only social interests the Court finds here, particularly in light of the dismissal of Mallerdino's cause for wrongful discharge, is the tension inherent in at-will employment and Wisconsin's tort of tortious interference.

When explaining the proximity of the interference to the termination, Mallerdino solely focuses on Rallo's "lie" that he did not receive vacation approval and the claim that

29

the starter form irregularities were an attempt to cover up this untruth. While the Court must draw inferences in Mallerdino's favor, this does not mean ignoring facts. The parties agree that Pfizer may enforce its policies and administrative guidelines, and Mallerdino ran afoul of these. Pfizer was under no obligation to accept his excuses or mitigate its punishment based on them. In fact, James–who is *not* a party to this suit, "could have overridden the intent of Defendants Rallo and Pitts to terminate Mr. Mallerdino but she did not do so." (PPFOF ¶ 173.) At his termination meeting, Mallerdino explained that his violation of Pfizer starter policy was accidental, but James either did not find it credible or chose to terminate Mallerdino's employment regardless of his explanations. Thus, despite Rallo's or Pitts's misrepresentations, Mallerdino was able to present his side of the story to James, who held veto power over Pitt's decision to terminate. While Rallo's lies may have occasioned the disciplinary meeting, it is less than clear that those lies, rather than Mallerdino's own undisputed conduct, led to his termination.

Mallerdino's characterization of the relations between the parties, as set forth in his opposition brief, is conclusory, at best. (*See* Pl.'s Opp'n Br. 40.) There is no fact to support the inference that Rallo was out to save his own "hide." No inferences, reasonable or otherwise, can support that claim against Pitts either.


III.     CONCLUSION

Mallerdino has failed to raise a genuine issue of material fact from which a jury might reasonably infer or find that his termination was connected to Rallo's and Pitts's belief that Mallerdino knew of their unlawful activities and might report that conduct either to Pfizer or governmental authorities. In reaching this conclusion, the Court has drawn all inferences in Mallerdino's favor and assumed that Rallo and Pitts were engaged in the conduct that Mallerdino alleges. The Court has also drawn all inferences in Mallerdino's favor and assumed that Mallerdino's violation of Pfizer guidelines was relatively minor and other employees who intentionally committed more egregious violations of Pfizer's guidelines were not terminated. However, there is nothing to connect those two bodies of facts other than Mallerdino's claim that they are connected. This is not a matter of the Court weighing the evidence, which it cannot do. Rather, no trier of fact could infer the improper motive suggested by Mallerdino from the facts presented. Put another way, even if Mallerdino's termination was an excessively harsh punishment for a mere administrative guideline infraction, that fact alone does not point to the improper motive that Mallerdino posits. Rallo's and Pitts conduct was privileged.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Defendants' Motion for Summary Judgment (Docket No. 46) is **GRANTED**.

The Clerk of Court shall enter judgment dismissing this action accordingly.

Dated at Milwaukee, Wisconsin this 19th day of July, 2006.

**BY THE COURT**


s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**